UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KHA'SUN CREATOR ALLAH,

                              Plaintiff,

        v.

SGT. DEPAOLO, *et al.*,

                              Defendants.

No. 17-CV-6313 (KMK)

OPINION & ORDER

Appearances:

Kha'Sun Creator Allah
Elmira, NY
*Pro Se Plaintiff*

Brendan Michael Horan, Esq.
Nicholas Patrick Stabile, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

        Kha'Sun Creator Allah ("Plaintiff"), currently an inmate at Elmira Correctional Facility,

brings this Action pursuant to 42 U.S.C. § 1983 against Superintendent Robert Cunningham

("Cunningham"), Sergeant DePaolo ("DePaolo"), Lieutenant T.J. Gonzalez ("Gonzalez"),

Deputy Superintendent of Security Timothy Humphrey ("Humphrey"), Chaplain Ndulaka

("Ndulaka"), and Special Housing Unit ("SHU") Director Donald Venettozzi ("Venettozzi")

(collectively, "Defendants"), each employees of the Woodbourne Correctional Facility

("Woodbourne"), a facility within the New York State Department of Corrections and

Community Supervision ("DOCCS").  (*See* Compl. (Dkt. No. 2).)  Plaintiff, a member of the

Nations of Gods and Earths ("NGE"), alleges that DePaolo, Gonzalez, Cunningham, and

Ndulaka violated his rights under the First and Fourteenth Amendments, the Religious Land Use

and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq*., and New York state law when they confiscated his NGE crown in March 2015 and otherwise harassed and retaliated against Plaintiff on the basis of his membership in NGE. Plaintiff also alleges that Gonzalez, Ndulaka, Humphrey, and Venettozzi violated his due process rights under the Fourteenth Amendment in connection with a March 2015 disciplinary hearing against Plaintiff. Before the Court is Defendants' Motion To Dismiss (the "Motion") (Not. of Mot. (Dkt. No. 31)), brought pursuant to Fed. R. Civ. P. 12(b)(6).

For the following reasons, the Motion is granted in part and denied in part.

## I. Background

### A. Factual Background

The following facts are drawn from Plaintiff's Complaint, and are taken as true for the purpose of resolving the instant Motion.

On March 2, 2015, while incarcerated at Woodbourne, Plaintiff was "coming from the law library" at about 3:45 p.m. when Defendant DePaolo stopped him and asked him "what religion he was in." (Compl. ¶¶ 2, 17–18.) Plaintiff responded that he is a member of NGE.[1] DePaolo told Plaintiff that "he is not allowed to [wear] a tassel" on his NGE crown. (*Id.* ¶ 19.) When Plaintiff explained that members of NGE "wear universal crowns with a tassel," DePaolo responded, "I don't see it in none of the directives. It's not allowed." (*Id.* ¶ 20.) Plaintiff further explained to DePaolo that a prior settlement agreement with DOCCS allows NGE members to wear crowns with tassels. (*Id.* ¶ 21.)[2] DePaolo became "belligerent," told Plaintiff, "I don't like

---

[1] For a description of NGE's "history, teachings, and practices," *see Marria v. Broaddus*, No. 97-CV-8297, 2003 WL 21782633, at *1–4 (S.D.N.Y. July 31, 2003).

[2] Plaintiff here refers to the settlement agreement in *Panayoty v. Annucci*, No. 11-CV-159 (N.D.N.Y. Oct. 29, 2013) (Dkt. No. 99), the text of which is attached as an exhibit to Plaintiff's

your tone, so step to the side," and thereafter took Plaintiff's identification card and wrote down the information on it. (*Id.* ¶¶ 21–22.)

On March 3, 2015, Plaintiff filed a grievance against DePaolo. (*Id.* ¶ 25.) The grievance was investigated and denied by Defendant Cunningham on March 31, 2015, despite his "finding[] that there was evidence to support the claim of staff harassment." (*Id.* ¶¶ 26–27.)

On March 10, 2015, at about 6:45 p.m., Plaintiff was again stopped by DePaolo "at the basement desk." (*Id.* ¶ 28.) DePaolo told Plaintiff that "his tassel is too long." (*Id.* ¶ 29.) Plaintiff responded that the tassel was under three inches long and thus permissible. (*Id.*) DePaolo told Plaintiff "to get against the wall." (*Id.* ¶ 30.) When Plaintiff "put his hands against the wall," DePaolo "pushed [him] against the wall while putting his knee into [his] back." (*Id.*) DePaolo further stated,

> 'You like to write grievances. You better ask about me you dumb nigger. You think you['re] god. I dare you to move so I can fuck you up.'

(*Id.*) In addition, DePaolo took Plaintiff's crown and told him that he would "not get[] this back." (*Id.* ¶ 31.) Plaintiff alleges DePaolo acted in "retaliation" for the grievance filed against him. (*Id.* ¶ 33.) All of this took place in the presence of Defendant Gonzalez, "who just sat at the basement desk" without intervening. (*Id.* ¶ 32.)

On March 11, 2015, Plaintiff filed a second grievance, this one against both DePaolo and Gonzalez. (*Id.* ¶ 34.) The grievance was investigated and denied by Cunningham on April 6, 2015. (*Id.* ¶¶ 35–36.)

Also on March 11, 2015, Plaintiff was called to see an unnamed prison official, who

---

memorandum in opposition to Defendants' Motion. (*See* Pl.'s Mem. of Law in Opp'n to Mot. ("Pl.'s Mem.") Ex. A ("*Panayoty* Settlement Agreement") (Dkt. No. 33).) The agreement provides in relevant part that "NGE adherents may wear head covering similar to the 'Kufi' worn by Muslim inmates, and adorned by a tassel not to exceed three inches." (*Id.* at 4.)

asked whether Plaintiff "wanted to discard or send his contraband crown home." (*Id.* ¶ 37.) Plaintiff informed the official that the crown did not present "a security issue" but a "religious issue," and that the official should "contact the chaplain[']s office." (*Id.* ¶ 38.) An hour later, Plaintiff went to the chaplain's office. (*Id.* ¶ 39.) There, Defendant Ndulaka told Plaintiff that he had directed the official "to return the crown" because Plaintiff is "allowed to have it." (*Id.*) A half-hour later, Plaintiff's crown was returned. (*Id.* ¶ 40.)

On March 14, 2015, at about 3:45 p.m., Plaintiff was approached by Gonzalez, who took him to an "officer's desk," where Gonzalez "pull[ed] out a contraband receipt" and told Plaintiff to remove his crown. (*Id.* ¶ 44.) Plaintiff responded that it was "his cultural right to wear his crown" and that Gonzalez was harassing Plaintiff and violating his rights. (*Id.* ¶¶ 45–46.) Plaintiff further told Gonzalez that "this was a religious issue not a security issue." (*Id.*) In response, Gonzalez "thr[ew]" Plaintiff against the wall, frisked him, handcuffed him, took him to the SHU, and confiscated his universal crown. (*Id.* ¶¶ 47–49.) In addition, Gonzalez filed a misbehavior report against Plaintiff for creating a disturbance, for possessing contraband, for interfering with a prison official, and for refusing a direct order. (*Id.* ¶¶ 50, 69.) Plaintiff alleges that Gonzalez acted in retaliation for the March 11, 2015 grievance filed against him. (*Id.* ¶ 50.)

On an unspecified date after March 14, 2015, while Plaintiff was in the SHU, he stopped Cunningham "during his rounds and informed him [that Plaintiff] wrote numerous grievances that were forwarded to him," and that Plaintiff was in the SHU "in retaliation for said grievances." (*Id.* ¶ 53.) Cunningham responded to Plaintiff, "I know who you are and [it's] about you not following staff direction[,] not religious freedom." (*Id.* ¶ 54.)

On March 15, 2015, Plaintiff received disciplinary charges resulting from the allegedly false and retaliatory misbehavior report filed by Gonzalez. (*Id.* ¶ 69.) On March 20, 2015, a

disciplinary hearing was held regarding the charges.  (*Id.* ¶ 57.)  Defendant Humphrey served as the hearing officer.  (*Id.* ¶ 70.)  At the hearing, Plaintiff called Ndulaka to testify.  (*Id.* ¶ 57.)  Ndulaka, however, "willingly lied" in his testimony by stating that the NGE "crown and the edge of the [tassel] [have] to be the same [length]," even though Ndulaka "knew no such rule existed."  (*Id.* ¶¶ 58–60.)  Further, Humphrey "refused to relay" Plaintiff's questions to Ndulaka regarding the rules pertaining to NGE crowns and tassels, and instead answered the questions himself, thus demonstrating that he "was not . . . impartial."  (*Id.* ¶¶ 71–72, 76–77.)  Humphrey also refused Plaintiff's request to call the "Ministerial Program Coordinator" as a witness.  (*Id.* ¶¶ 73–75.)

On March 27, 2015, Plaintiff was found guilty of all charges in the misbehavior report and assessed a penalty of 180 days in the SHU.  (*Id.* ¶ 78.)  Plaintiff filed an administrative appeal to Defendant Venettozzi.  (*Id.* ¶ 79.)  Venettozzi reviewed Plaintiff's appeal and "refus[ed] to overturn" the guilty finding "despite . . . knowledge of . . . due process violations."  (*Id.* ¶¶ 80, 93.)  However, Venettozzi reduced Plaintiff's SHU penalty to 90 days.  (*Id.* ¶ 80.)

Plaintiff alleges that no Muslims, Jews, or Rastafarians were "harassed or placed in SHU for wearing their" respective headcoverings.  (*Id.* ¶¶ 64–66.)

On April 6, 2015, Plaintiff filed a third grievance, his second against Gonzalez.  (*Id.* ¶¶ 51–52.)  The grievance was investigated and denied by Cunningham on May 13, 2015.  (*Id.*)

B.  Procedural Background

Plaintiff filed his Complaint and requested to proceed in forma pauperis ("IFP") on August 17, 2017.  (Dkt. Nos. 1, 2.)  On December 21, 2017, the Court granted the IFP request.  (Dkt. No. 4.)  On December 27, 2017, the Court issued an Order directing service on Defendants.  (Dkt. No. 6.)  Service was thereafter effected.  (Dkt. Nos. 10, 12, 13, 14, 18, 19, 26.)

On May 4, 2018, the Court set a briefing schedule for Defendants' Motion To Dismiss.

(Dkt. No. 28.)  On July 23, 2018, Defendants filed their Motion and accompanying papers.  (*See* Not. of Mot.; Defs.' Mem. of Law in Supp. of Mot. ("Defs.' Mem.") (Dkt. No. 32).)  On August 20, 2018, Plaintiff filed his response in opposition to the Motion.  (Pl.'s Mem.)  On September 6, 2018, Defendants filed their reply, (Dkt. No. 34), which was an exact duplicate of their initial memorandum.  On February 13, 2019, Defendants filed a letter with the Court regarding the error, (Dkt. No. 38), attaching the correct reply memorandum, (Reply Mem. of Law in Further Supp. of Defs.' Mot. ("Defs.' Reply") (Dkt. No. 38-1)), and requesting the Court consider it. The Court granted the request.  (Dkt. No. 39.)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, alteration, and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (alteration and quotation marks omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the

line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations . . . ." (quotation marks omitted)). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Where, as here, a plaintiff proceeds pro se, the "complaint[] must be construed liberally and interpreted to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding

procedural rules and to comply with them." (italics and quotation marks omitted)).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks and citation omitted). When a plaintiff proceeds pro se, however, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a] defendant's request for a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at *2 (E.D.N.Y. Sept. 19, 2013), and "documents that the plaintiff[] either possessed or knew about and upon which [he or she] relied in bringing the suit," *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).

B. Analysis

Plaintiff brings claims against DePaolo, Gonzalez, Cunningham, and Ndulaka under the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, RLUIPA, and various New York state constitutional provisions, laws, and directives. (*See* Compl. ¶¶ 88–91.) Plaintiff also brings claims against Humphrey and Venettozzi under the Due Process Clause of the Fourteenth Amendment. (*See id.* ¶¶ 92–93.) Construed liberally, the Complaint also alleges Due Process Clause claims against Gonzalez and Ndulaka. (*See id.* ¶¶ 50, 57–60, 69.) Plaintiff

seeks declaratory relief as well as compensatory and punitive damages.  (*See id.* at 18–21.)[3]

Defendants argue that all claims — except for the First Amendment retaliation claims against DePaolo and Gonzalez in their individual capacities — must be dismissed.  (*See* Defs.' Mem. 2–3, 24 n.4, 25 n.5; Defs.' Reply 1.)  In particular, Defendants argue that Plaintiff's requests for equitable relief are moot; that Defendants are entitled to qualified immunity from money damages on the First Amendment free exercise claims; that Plaintiff fails to state a RLUIPA claim; that Plaintiff fails to state an equal protection claim and that, in any event, Defendants are entitled to qualified immunity; that Plaintiff fails to allege Cunningham's personal involvement and that Cunningham is entitled to qualified immunity; that Plaintiff fails to state a due-process claim; that Venettozzi is entitled to qualified immunity; that Plaintiff fails to state a claim against Ndulaka and that, in any event, Ndulaka is entitled to qualified immunity; and that Plaintiff's state law claims are barred by New York law.[4]  (*See* Defs.' Mem. 7–25.)

The Court addresses each argument to the extent necessary.

1.  Mootness

As a preliminary matter, Plaintiff's request for declaratory relief, (*see* Compl. 18–19), is

---

[3] The Complaint contains both numbered and unnumbered paragraphs.  Where not possible to cite to the numbered paragraph, the Court cites to the ECF-generated page numbers stamped at the top right-hand corner of the Complaint.

[4] Defendants also argue that Plaintiff fails to state a claim as to the March 2, 2015 incident in which DePaolo asked Plaintiff's religion, took his identification card, and wrote down his information.  (Defs.' Mem. 14.)  Plaintiff has clarified that he is "only relaying the first incident" as a "preface to future violations" and because it "is part of the story line and puts all the following events . . . in context."  (Pl.'s Mem. 2.)

In addition, Defendants argue that Plaintiff fails to state an Eighth Amendment excessive-force and failure-to-intervene claim against DePaolo and Gonzalez regarding the March 10, 2015 incident.  (Defs.' Mem. 23–24.)  Plaintiff has clarified that he does not bring an excessive-force claim, and instead seeks to bring that claim as a "violation of the Free Exercise Clause and RLUIPA through physical means."  (Pl.'s Mem. 3.)

moot. "[A]n inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility." *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) (citations omitted). Plaintiff has been transferred from Woodbourne — the facility at which the alleged constitutional violations occurred — and to Elmira Correctional Facility ("Elmira"). (*See* Pl.'s Mem. 18; Defs.' Mem. 11.) All Defendants are officials at Woodbourne. The Complaint does not allege, and Plaintiff does not argue, that Defendants have any connection with Elmira. Accordingly, the Court "hold[s] moot all injunctive and declaratory claims." *Salahuddin*, 467 F.3d at 272.

### 2. Free Exercise and RLUIPA Claims

#### a. Applicable Law

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). A prisoner's free exercise rights, however, are "[b]alanced against . . . the interests of prison officials charged with complex duties arising from the administration of the penal system." *Id.* (citation and quotation marks omitted). Accordingly, a prisoner's free exercise claims are "judged under a reasonableness test less restrictive than ordinarily applied to alleged infringements of fundamental constitutional rights." *Id.* (citation and quotation marks omitted). To state a free exercise claim, an inmate "must make a threshold showing that 'the disputed conduct substantially burdened his sincerely held religious beliefs.'" *Washington v. Chaboty*, No. 09-CV-9199, 2015 WL 1439348, at *9 (S.D.N.Y. Mar. 30, 2015) (quoting *Washington v. Gonyea*, 538 F. App'x 23, 26 (2d Cir. 2013)); *see also Salahuddin*, 467 F.3d at 274–75 (same). To show a belief is "sincere," the inmate "need only demonstrate that the beliefs professed are sincerely

held and in the individual's own scheme of things, religious." *Ford*, 352 F.3d at 588 (citations,

alterations, and quotation marks omitted). To show a "substantial burden," the inmate must

show that "the state [has] put[] substantial pressure on an adherent to modify his behavior and to

violate his beliefs." *Rossi v. Fishcer*, No. 13-CV-3167, 2015 WL 769551, at *7 (S.D.N.Y. Feb.

24, 2015) (citations and quotation marks omitted). That is, "[t]he relevant question in

determining whether [the inmate's] religious beliefs were substantially burdened is whether

participation in the [religious activity], in particular, is considered central or important to [the

inmate's religious] practice." *Ford*, 352 F.3d at 593–94. "Once [an inmate] establishes this

burden, '[t]he defendants then bear the relatively limited burden of identifying the legitimate

penological interests that justify the impinging conduct.'" *Smith v. Perlman*, No. 11-CV-20,

2012 WL 929848, at *7 (N.D.N.Y. Mar. 19, 2012) (quoting *Salahuddin*, 467 F.3d at 275). The

burden then shifts back to the inmate "to show that these articulated concerns were irrational."

*Salahuddin*, 467 F.3d at 275 (citation, quotation marks, and alteration omitted).

RLUIPA, in turn, "protects institutionalized persons who are unable freely to attend to

their religious needs and are therefore dependent on the government's permission and

accommodation for exercise of their religion," *Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005),

and "provides a more stringent standard than does the First Amendment, barring the government

from imposing a substantial burden on a prisoner's free exercise unless the challenged conduct or

regulation furthers a compelling governmental interest and is the least restrictive means of

furthering that interest," *Holland v. Goord*, 758 F.3d 215, 224 (2d Cir. 2014) (citation,

alterations, and quotation marks omitted); *see also Salahuddin*, 467 F.3d at 273 ("RLUIPA

protects inmates by providing that a government shall not 'impose a substantial burden' on the

'religious exercise' of inmates in certain institutions unless the government shows that the

burden furthers a compelling governmental interest by the least restrictive means.'" (footnote

omitted) (quoting 42 U.S.C. § 2000cc–1(a))). While "RLUIPA does not define 'substantial

burden,' . . . the Second Circuit has assumed that '[s]ince substantial burden is a term of art in

the Supreme Court's free exercise jurisprudence[,] . . . Congress, by using it, planned to

incorporate the cluster of ideas associated with the Court's use of it." *Panayoty v. Annucci*, 898

F. Supp. 2d 469, 481–82 (N.D.N.Y. 2012) (quoting *Westchester Day Sch. v. Village of

Mamaroneck*, 504 F.3d 338, 348 (2d Cir. 2007)). "[A] substantial burden is one that '[put[s]

substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Id.* at 482

(quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 717–18 (1981)). Whether

a prisoner sufficiently pleads a substantial burden on a sincerely held religious belief under

RLUIPA involves the same threshold analysis as under the First Amendment. *See Valdez v. City

of New York*, No. 11-CV-5194, 2013 WL 8642169, at *12 (S.D.N.Y. Sept. 3, 2013), *adopted by*

2014 WL 2767201 (S.D.N.Y. June 17, 2014). "Where a plaintiff adduces evidence sufficient to

show that the government practice substantially burdens [his or] her religious exercise, the onus

shifts to the government to demonstrate that the practice furthers a compelling governmental

interest, and that the burden imposed on religion is the least restrictive means of achieving that

interest." *Jova v. Smith*, 582 F.3d 410, 415 (2d Cir. 2009) (citing 42 U.S.C. § 2000cc–2(b)).

### b. Analysis

#### i. Free Exercise Clause Claims

Defendants do not argue on the merits that Plaintiff's religious beliefs are not sincerely

held, that Plaintiff's exercise of those beliefs was not substantially burdened by the conduct of

DePaolo, Gonzalez, Cunningham, or Ndulaka, or that Plaintiff otherwise fails to state a free

exercise claim. Rather, Defendants argue that, in any event, they are entitled to qualified

immunity from money damages on the free exercise claims.  (Defs.' Mem. 8–9.)

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation and quotation marks omitted).  Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law." *City & County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (citation and quotation marks omitted).  Because qualified immunity is "an affirmative defense [that] . . . reflects an immunity from suit rather than a mere defense to liability[,] . . . it is appropriate to decide the issue of qualified immunity, when raised, at an early stage of the litigation, such as when deciding a pre-answer motion to dismiss." *Betts v. Shearman*, No. 12-CV-3195, 2013 WL 311124, at *4 (S.D.N.Y. Jan. 24, 2013) (emphasis and quotation marks omitted) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), and *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74–75 (2d Cir. 1998)), *aff'd*, 751 F.3d 78 (2d Cir. 2014).

In determining whether a right is clearly established, the "inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson*, 555 U.S. at 244 (citation and quotation marks omitted).  "In the Second Circuit, 'a right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful.'" *Schubert v. City of Rye*, 775 F. Supp. 2d 689, 702 (S.D.N.Y. 2011) (quoting *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004)).  Put differently, a right is "'clearly established' if the [Supreme

Court or Second Circuit's] decisions 'clearly foreshadow' a particular ruling on the issue."

*Varrone v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997) (citation omitted).

Here, Plaintiff's right to exercise his religious beliefs by wearing an NGE crown has not

been "clearly established" as a matter of federal law. The case of *Boyd v. Arnone*, 48 F. Supp. 3d

210 (D. Conn. 2014), is instructive. There, an inmate, also a member of NGE, brought a free

exercise claim alleging that certain prison officials "violated his right to exercise his NGE beliefs

when they classified the NGE as a disruptive group, denied him the opportunity to worship as a

collective group and wear an NGE crown, and rejected many volumes of [an NGE publication]."

*Id.* at 220. The prison officials moved to dismiss on the ground of qualified immunity. *Id.* The

court held that:

> Because neither the Second Circuit[] nor the Supreme Court has held that the NGE
> is a religion or that its adherents have a right to possess NGE literature or wear an
> NGE crown, it was not unreasonable for the [prison officials] to believe that
> designating the NGE as a disruptive group, monitoring incoming NGE mail and
> literature for safety and security reasons, and denying the [inmate] permission to
> engage in collective worship and wear an NGE crown did not violate the law at the
> relevant time.

*Id.* at 221–22. Accordingly, the court held that the officials were entitled to qualified immunity

from money damages on the inmate's free exercise claim. *Id.*

No material facts separate this case from *Boyd*. Since *Boyd* was issued in 2014, neither

the Supreme Court or nor the Second Circuit has recognized NGE as a religion for First

Amendment purposes or recognized that NGE members have a First Amendment-protected right

to wear a crown. Nor has any such decision "clearly foreshadow[ed]" as much. *Varrone*, 123

F.3d at 79.[5] To be sure, prior to *Boyd*, district courts in this Circuit have held that NGE

_____

[5] The closest case may be *Barnes v. Furman*, 629 F. App'x 52 (2d Cir. 2015) (summary
order). There, a Jewish inmate alleged that prison officials confiscated his Rastafarian religious
headcovering in violation of the Free Exercise Clause. *Id.* at 53. The district court granted

adherents' sincere beliefs entitled them to First Amendment protection. *See Marria v. Broaddus*,

No. 97-CV-8297, 2003 WL 21782633, at *12 (S.D.N.Y. July 31, 2003) (holding, following a

bench trial, that the "plaintiff's beliefs as a member of the [NGE] are both sincere and 'religious

in nature' and therefore entitled to RLUIPA and First Amendment protection under the free

exercise clause" (collecting cases)); *see also Joseph v. Fischer*, 900 F. Supp. 2d 320, 325

(W.D.N.Y. 2012) ("As the court in *Marria* noted, [NGE] adherents are entitled to protection

under both the First Amendment and RLUIPA."); *Panayoty v. Annucci*, 898 F. Supp. 2d 469,

482–83 (N.D.N.Y. 2012) ("[The] [p]laintiffs have established that NGE practices are, for First

---

summary judgment for the defendant officials on grounds of qualified immunity. *Id.* The
Second Circuit reversed. *Id.* at 56. It reasoned that, "[a]lthough we have never held that prison
officials are obligated to provide an inmate with 'head coverings of their choice,' it has
nonetheless been well established that prisoners 'retain some measure of the constitutional
protections afforded by the First Amendment's Free Exercise Clause,'" *id.* (quoting *Ford*, 352
F.3d at 588), that "burdens on prisoners' free exercise rights must be justified against a
legitimate penological interest," *id.* (citing *Ford*, 352 F.3d at 594–95), and that "prison officials
could not rely solely on the opinions of the New York Board of Rabbis in assessing the sincerity
of [an inmate's] religious belief," *id.* (citing *Ford*, 352 F.3d at 590, 597–98). Therefore, the
Second Circuit held, "we cannot say as a matter of law that it was objectively reasonable for
those defendants to believe that denying [a Rastafarian headcovering] to an inmate registered as
Jewish was constitutional." *Id.* at 57.

    *Barnes*, however, is an unpublished summary order. "The Second Circuit has indicated
that courts in this Circuit may not rely on its unpublished summary orders as clearly established
law to deny qualified immunity." *Ikezi v. City of New York*, No. 14-CV-5905, 2017 WL
1233841, at *16 (E.D.N.Y. Mar. 31, 2017) (citing *Matusick v. Erie County Water Auth.*, 757
F.3d 31, 61 (2d Cir. 2014) ("We have specifically cautioned against the reliance on non-
precedential summary orders in clearly established analyses because non-precedential decisions,
by their very definition, do not make law." (citation, quotation marks, and alterations omitted))).
Accordingly, the Court may not rely on *Barnes* as having "clearly established" the law.

    Further, *Barnes* is distinguishable from this case. *Barnes* involved a Jewish inmate — a
member of a recognized faith group with a recognized right to wear a particular religious
headcovering. Thus, the dispute in *Barnes* was over whether it was reasonable to restrict such an
inmate's *choice* of headcovering. Here, by contrast, the antecedent questions whether NGE is a
recognized faith group and whether NGE adherents have the right to wear a particular religious
headcovering have not been clearly established as a matter of federal law. Accordingly, *Barnes*
is not dispositive in this case.

Amendment purposes, religious in their scheme of beliefs and such beliefs are sincerely held."), *adopted by* 2012 WL 4378127 (N.D.N.Y. Sept. 25, 2012). Yet, the Second Circuit has squarely held that "a district court decision does not 'clearly establish' the law." *Richardson v. Selsky*, 5 F.3d 616, 623 (2d Cir. 1993) (citation omitted); *see also Birch v. City of New York*, 184 F. Supp. 3d 21, 31 (E.D.N.Y. May 3, 2016) (same), *aff'd*, 675 F. App'x 43 (2d Cir. 2017).[6]

Plaintiff argues in response that DOCCS has agreed to "recognize NGE as a faith, and, as such, treat its adherents as it would the adherents of any religion recognized by DOCCS," and has further agreed that "NGE adherents may wear head covering[s] similar to the 'Kufi' worn by Muslim inmates, and adorned by a tassel not to exceed three inches." (*Panayoty* Settlement Agreement ¶¶ 5(a), (f); *see also Marria v. Broaddus*, No. 97-CV-8297, 2004 WL 1724984, at *2–3 (S.D.N.Y. July 30, 2004) (approving DOCCS-proposed "protocols for sincere adherents of [NGE] religious practices").) Yet, as Defendants argue, a "voluntary agreement by DOCCS . . . even if approved by a district court . . . cannot serve to clearly establish that there is a federal constitutional right to practice NGE as a religion." (Defs.' Reply 3 (emphasis omitted).) Put differently, if a published district court opinion cannot clearly establish federal law for qualified immunity purposes, *see Richardson*, 5 F.3d at 623, then, a fortiori, neither can a settlement agreement approved by a district court. Until the Second Circuit or the Supreme Court addresses the question whether an NGE member have a First Amendment right to certain religious headcoverings, the right is not clearly established and, consequently, a reasonable prison official would not have understood that his conduct — refusing to allow Plaintiff to wear his crown —

---

[6] Moreover, the plaintiff in *Marria* had earlier "concede[d] that qualified immunity [from money damages] is appropriate with respect to his First Amendment and RLUIPA claims." *Marria v. Broaddus*, 200 F. Supp. 2d 280, 300 (S.D.N.Y. 2002) (summary judgment opinion). Accordingly, the post-trial *Marria* opinion dealt only with the remaining requests for declaratory and injunctive relief. *See Marria*, 2003 WL 21782633, at *1.

was unlawful. *See Blalock v. Jacobsen*, No. 13-CV-8332, 2016 WL 796842, at *1, *4 (S.D.N.Y. Feb. 22, 2016) (granting qualified immunity on free exercise claim where an inmate — "an orthodox Muslim" who "wears his state-issued pants hemmed above his ankles, to comply with a Muslim religious edict" — challenged a prison official's memorandum generally forbidding such hemming, because "neither the Supreme Court nor the Second Circuit has ever ruled that a prisoner's right to free exercise encompasses the right to wear pants at any particular length" (citation omitted)); *see also Breland v. Goord*, No. 94-CV-3696, 1997 WL 139533, at *8 (S.D.N.Y. Mar. 27, 1997) ("Neither the Supreme Court nor the Second Circuit . . . has held that Five Percenters constitute a religion and no court has spoken to the constitutional protections to be afforded Five Percenter literature. . . .  While the claims here come perilously close to the line, the narrow and fact-specific manner in which this Circuit defines qualified immunity leads to the conclusion that defendants here did not violate a clearly established right of plaintiff's and they are entitled to qualified immunity.").  Therefore, Defendants are entitled to qualified immunity from money damages on Plaintiff's Free Exercise Clause claims.

Qualified immunity does not, however, provide government officials protection from suits brought against them in their official capacities, nor does it provide protection from claims for equitable relief.  *See Rodriguez v. City of New York*, 72 F.3d 1051, 1065 (2d Cir. 1995) ("[T]he defense of qualified immunity protects only individual defendants sued in their individual capacity, not governmental entities, and it protects only against claims for damages, not against claims for equitable relief." (citations omitted)); *see also Barnes v. Fedele*, 760 F. Supp. 2d 296, 300–01 (W.D.N.Y. 2011) (holding that the plaintiff's request for equitable relief, namely, "the return of his crown," is "not barred by the Eleventh Amendment").   Yet, Plaintiff sues Defendants only in their individual capacities.  (*See* Compl. ¶¶ 3–8.)  Nor can Plaintiff sue

Defendants in their official capacities, for a claim against state officials in their official capacities "is deemed to be a suit against the state," and as such the officials are "entitled to invoke the Eleventh Amendment immunity belonging to the state." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993). Further, the Court has already held that Plaintiff's request for equitable relief is moot. *See supra* Section II.B.1. Accordingly, Plaintiff's Free Exercise Clause claims must be dismissed in their entirety with prejudice.

### ii. RLUIPA Claims

As noted, Plaintiff sues Defendants in their individual capacities. (*See* Compl. ¶¶ 3–8.) However, "RLUIPA does not provide a cause of action against state officials in their individual capacities." *Gonyea*, 731 F.3d at 145. In light of the liberal treatment afforded pro se litigants, *see Sykes*, 723 F.3d at 403, the Court thus construes Plaintiff's RLUIPA claims as brought against Defendants in their official capacities. However, the Supreme Court has squarely held that RLUIPA does not abrogate state sovereign immunity against suits for money damages. *See Sossamon v. Texas*, 563 U.S. 277, 285–86 (2011) (holding that "RLUIPA's authorization of 'appropriate relief against a government,' is not the unequivocal expression of state consent that our precedents require," and that "'[a]ppropriate relief' does not so clearly and unambiguously waive sovereign immunity to private suits for damages that we can 'be certain that the State in fact consents' to such a suit" (citations omitted)). Further, as noted, Plaintiff's claims for equitable relief are moot. *See supra* Section II.B.1. Accordingly, Plaintiff's RLUIPA claims must be dismissed with prejudice.

### 3. Equal Protection Clause Claims

#### a. Applicable Law

"The Equal Protection Clause of the Fourteenth Amendment requires that all persons

similarly situated be treated in the same manner." *Allen v. Cuomo*, 100 F.3d 253, 260 (2d Cir. 1996) (citing *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985)). "[T]o assert an equal protection claim, a plaintiff must plead (1) adverse treatment 'compared with similarly situated individuals,' and (2) 'that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Marom v. Town of Greenburgh*, No. 13-CV-4733, 2015 WL 783378, at *9 (S.D.N.Y. Feb. 23, 2015) (quoting *Miner v. Clinton County*, 541 F.3d 464, 474 (2d Cir. 2008)). This requires a showing of "discriminatory intent or purpose." *Village of Arlington Heights v. Met. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977); *see also Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (holding that a plaintiff must allege "that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination" (citation omitted)); *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (holding that a plaintiff "must prove purposeful discrimination, directed at an identifiable or suspect class" (citing *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987), and *Kadrmas v. Dickinson Pub. Schs.*, 487 U.S. 450, 457–58 (1988)).

Where there is no allegation of membership in a protected class, the plaintiff may still prevail on either a "class of one" or "selective enforcement" theory. *See Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 433 (S.D.N.Y. 2013). A "class-of-one" claim requires the plaintiff allege that he was "[1] intentionally treated differently from others similarly situated and [2] that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (citations omitted). That is, the plaintiff must allege that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate

government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake. *Fahs Constr. Grp., Inc. v. Gray*, 725 F.3d 289, 292 (2d Cir. 2013) (citation and quotation marks omitted). A class-of-one plaintiff must show "an extremely high degree of similarity between [himself] and the persons to whom [he] compare[s] [himself]." *Ruston v. Town Bd. for Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010) (citation and quotation marks omitted); *see also Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 815 F. Supp. 2d 679, 696 (S.D.N.Y. 2011) (noting that a class-of-one plaintiff "must identify comparators whom a prudent person would think were roughly equivalent," although he "need not show an exact correlation between [himself] and the comparators").

A "selective enforcement" claim requires the plaintiff show both (1) that "he, compared with others similarly situated, was selectively treated," and (2) that "the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, or to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the plaintiff." *Vaher*, 916 F. Supp. 2d at 433 (quotation marks and alterations omitted) (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995)). Although "there is some disagreement within the Second Circuit regarding the degree of similarity necessary to adequately allege an equal protection claim under this theory," with "some courts evaluat[ing] whether a comparator is similarly situated under the same standard used in 'class of one' equal protection claims" and other courts "apply[ing] a less demanding standard to selective enforcement claims," *Panzella v. City of Newburgh*, 231 F. Supp. 3d 1, 7 (S.D.N.Y. 2017) (citations omitted) (collecting cases), it is clear that, at a minimum, some showing of comparison with others similarly situated is required.

b.  Analysis

Defendants argue that the Complaint fails to show either that Plaintiff suffered adverse treatment compared with similarly situated individuals or that any Defendant acted with discriminatory intent, and, in any event, that Defendants are entitled to qualified immunity.  (*See* Defs.' Mem. 12–14.)

As an initial matter, construing the Complaint in the light most favorable to Plaintiff, Plaintiff alleges sufficient facts to plausibly state that one Defendant intentionally discriminated against him because of his religion.  The Complaint first alleges that on March 2, 2015, DePaolo asked Plaintiff "what religion he was in" and, when Plaintiff answered, told him that he could not wear a tassel with his NGE crown.  (Compl. ¶¶ 18–19.)  It then alleges that DePaolo's basis for that statement was: "I don't see it in none of the directives.  It's not allowed."  (*Id.* ¶ 20.)  The Complaint next alleges that, on March 10, 2015, following Plaintiff's filing of his first grievance against DePaolo, DePaolo stopped Plaintiff, told him that the tassel on his NGE crown was too long, pushed Plaintiff against the wall, and stated:

> You like to write grievances.  You better ask about me you dumb nigger.  You think you['re] god.  I dare you to move so I can fuck you up.

(*Id.* ¶ 28–33.)  DePaolo then took Plaintiff's crown and told him that he would "not get[] this back."  (*Id.* ¶ 31.)  According to the Complaint, DePaolo's conduct was a form of "retaliation" for Plaintiff's filing a grievance against him.  (*Id.* ¶ 33.)

As first detailed in *Marria*, NGE "traces its roots to the Black Muslim movement" and "professe[s] a central belief that every black man is an embodiment of God."  *Marria*, 2003 WL 21782633, at *1–2; *see also Tucker v. Collier*, 906 F.3d 295, 298 (5th Cir. 2018) ("Nation adherents also believe in the inner divinity of African-Americans: male adherents are 'Gods,' and female adherents are 'Earths.'"); *Fraise v. Terhune*, 283 F.3d 506, 511 (3d Cir. 2002)

(noting briefing stating that NGE members "are African Americans who have achieved self-knowledge" and that "[m]ale members of the group are referred to as 'Gods'").  Thus, given that NGE is, at least in part, a race-based religion that conceives of its male members as divine, a jury could conclude that DePaolo's alleged conduct — his use of a racial epithet, reference to Plaintiff's belief that he is God, threat of physical assault, and confiscation of Plaintiff's NGE crown — was the "result of intentional or purposeful discrimination." *Phillips*, 408 F.3d at 129.[7] In other words, the Complaint contains sufficient factual detail to plausibly suggest that DePaolo's purposefully discriminated against Plaintiff *because of* his membership in NGE.  *See id.* (reversing dismissal of equal protection claim where the "complaint contained a litany of allegations purporting to demonstrate that black inmates were treated differently than whites vis-à-vis restriction of visitation" and "made specific allegations" that prison officials used repeated racial slurs, thus "demonstrating racial animus"); *White v. City of New York*, 206 F. Supp. 3d 920, 931–32 (S.D.N.Y. 2016) (holding allegation that defendants' "demeanor changed when they learned [the plaintiff] was a transgender man, and that they became 'uncooperative' and expressed 'obvious distaste' for him" as "sufficient to state a plausible claim of discriminatory intent"); *Lopez v. Cipolini*, 136 F. Supp. 3d 570, 592–93 (S.D.N.Y. 2015) (holding the plaintiff "sufficiently plead[ed] that [the defendant] intentionally discriminated against her" where she alleged "that she was prohibited from attending religious services 'because of her hair and her sexuality'" (alterations omitted)); *Randle v. Alexander*, 960 F. Supp. 2d 457, 476–77 (S.D.N.Y. 2013) (denying motion to dismiss equal protection claim where the inmate alleged numerous

---

[7] To be sure, given that the Complaint also alleges that DePaolo's conduct was caused by his understanding of the prison directives, (*see* Compl. ¶ 20), and was a form of retaliation for his filing of grievances, (*see id.* ¶¶ 30, 41, 46, 50, 54, 56), a jury might also conclude that DePaolo did not act because of purposeful religious discrimination.  However, that is not a basis for dismissal at the Rule 12(b)(6) stage.

facts suggesting "that the forced fights orchestrated by [the defendant] were racially motivated" and further provided a "detailed factual background . . . throughout his [c]omplaint").[8]

However, beyond demonstrating intentional discrimination, Plaintiff also must plausibly show that "other similarly situated individuals" were treated differently. *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005). The Complaint alleges that, "as a sincere adherent of [NGE]," he "was treated differently than others similarly situated as a result of intentional discrimination"; that he "was the only [inmate] harassed . . . for wearing a cultural headcovering because [he is] in [NGE]"; that no Muslim, Jewish, or Rastafarian inmates were similarly harassed . . . for wearing their respective headcoverings; and that Defendants "showed intentional discrimination" against Plaintiff by harassing him while "let[tting] adherents of other religions wear their religious headcoverings without issue or fear of harassment." (*Id.* ¶¶ 61–62, 64–67.)

Yet, even assuming Plaintiff has alleged sufficient facts showing that he, as an NGE adherent, was substantially similar to Muslim, Jewish, or Rastafarian adherents, Defendants are entitled to qualified immunity on the question. Because neither the Second Circuit nor the

---

[8] The Court notes that Plaintiff's other equal protection allegations do not plausibly suggest intentional discrimination on the basis of religion. For example, Plaintiff alleges that, on March 14, 2015, Gonzalez ordered Plaintiff to remove his NGE crown, ignored Plaintiff's response that he had a "cultural right to wear his crown," pushed him against the wall and frisked and handcuffed him, took him to the SHU, and confiscated his crown. (Compl. ¶¶ 44–49.) The Complaint does not allege that Gonzalez acted with the intent to discriminate against Plaintiff because of his religion; to the contrary, Plaintiff alleges that Gonzalez's conduct was "harassment and retaliation" for his filing of prior grievances against him. (*Id.* ¶¶ 46, 50.) *See, e.g.*, *Brown v. Semple*, No. 18-CV-1239, 2018 WL 5619195, at *5 (D. Conn. Oct. 30, 2018) (dismissing equal protection claim alleging prison officials denied inmate a "Wicca bible" because the complaint "repeatedly gives the reason for this treatment" — the bible was "written in code" and thus posed a possible security issue — and "does not allege that prison officials enforced this policy selectively" or "used the policy pretextually"); *Traylor v. Hammond*, 94 F. Supp. 3d 203, 215 (D. Conn. 2015) ("The naked assertion . . . that [religion] was a motivating factor without a fact-specific allegation of a causal link between defendant's conduct and the plaintiff's [religion] is too conclusory to survive a motion to dismiss." (alterations and quotation marks omitted) (quoting *Yusuf v. Vassar College*, 827 F. Supp. 952, 955–56 (S.D.N.Y. 1993))).

Supreme Court has addressed the unsettled First Amendment status of NGE, it is not "clearly established" that NGE adherents enjoy a First Amendment right to wear religious headcoverings, *Luna*, 356 F.3d at 490, and, consequently, a reasonable prison official would not have understood that his conduct — here, repeatedly refusing to allow Plaintiff to wear his crown while permitting Muslim, Jewish, and Rastafarian inmates to wear their headcoverings — was unlawful. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017) ("[I]f a reasonable officer might not have known for certain that the conduct was unlawful — then the officer is immune from liability."); *Spearman v. Ide*, No. 17-CV-543, 2018 WL 3382894, at *6 (D. Conn. July 10, 2018) ("The question is not whether the defendant acted in good faith or what the defendant knew or believed, but rather what would have been known to or believed by a reasonable officer in the defendant's position." (citing *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018)). Therefore, Defendants are entitled to qualified immunity from money damages on Plaintiff's equal protection claims pertaining to his religion.[9]

### 4. Claims Against Cunningham

Plaintiff alleges that Cunningham, the Woodbourne Superintendent, received Plaintiff's three grievances against DePaolo and Gonzalez, investigated and denied those grievances, and thus "did nothing to remedy the situation." (Compl. ¶¶ 26–27, 35–36, 51–52, 55, 90.) Plaintiff further alleges that, on March 15, 2015, one day after being placed in the SHU but before his grievances had been denied, he "stopped Defendant Cunningham during his rounds and informed

---

[9] The Court notes that the Complaint plainly alleges DePaolo's "racial animus" toward Plaintiff. *Phillips*, 408 F.3d at 126, 130. Yet, Plaintiff does not make an equal protection claim on the basis of race, (*see* Compl. ¶¶ 88–94), and, even construing the Complaint liberally to encompass such a claim, the Complaint does not allege other facts suggesting that Plaintiff was treated differently or intentionally discriminated against because of his race. Accordingly, the Court grants Plaintiff leave to plead a race-based equal protection claim, if he so chooses.

him he wrote numerous grievances . . . regarding being harassed for wearing his universal crown and is currently in SHU in retaliation for said grievances and exercising his cultural right of wearing a crown." (*Id.* ¶¶ 53–55.) In Plaintiff's view, "Cunningham's inaction resulted in [his] being retaliated against" by other Defendants. (*Id.* ¶ 56.) Defendants argue these allegations fail to allege the personal involvement of Cunningham in any constitutional violation. (Defs.' Mem. 16.) The Court need not resolve the issue. "Because courts in this district are divided regarding whether a supervisor who denies a grievance is personally involved in the underlying constitutional violation, Defendant [Cunningham] could reasonably have been unaware that his actions were unlawful." *Corbett v. Annucci*, No. 16-CV-4492, 2018 WL 919832, at *8 (S.D.N.Y. Feb. 13, 2018); *see also id.* at *7 (collecting cases). "Therefore, to the extent that Defendant [Cunningham's] only personal involvement with Plaintiff's [alleged constitutional] deprivations is his denial of Plaintiff's grievance[s], he is entitled to qualified immunity." *Id.* at *8. "However, to the extent that Plaintiff can, in good faith, allege more facts that personally involve Defendant [Cunningham] in the purported constitutional violations, Plaintiff is granted leave to re-plead his claim." *Id.*

### 5. Due Process Clause Claims

Defendants argue that Plaintiff fails to state a due process claim against any Defendant. (See Defs.' Mem. 17–19.)

A prison inmate "has the right not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986). "[T]o present a [procedural] due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001) (citation and quotation marks omitted). "The

appropriate process depends on the balancing of three factors: (1) 'the private interest that will be affected by the official action;' (2) 'the risk of erroneous deprivation of such interest through the procedures used;' and (3) 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" *Panzella v. Sposato*, 863 F.3d 210, 218 (2d Cir. 2017) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)), *as amended* (July 18, 2017).

Plaintiff alleges sufficient facts to make out a procedural due process claim. First, the Complaint alleges that on March 15, 2015, Gonzalez issued Plaintiff a "retaliatory" and "falsified" misbehavior report for "creating a disturbance, contraband, interference with employee[,] and refusing a direct order," in response to Plaintiff's filing multiple grievances against him. (Compl. ¶¶ 50, 57, 69.) "In general, a prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Willey v. Kirkpatrick*, 801 F.3d 51, 63 (2d Cir. 2015) (quotation marks omitted) (citing *Freeman*, 808 F.2d at 951); *see also Boddie v. Schneider*, 105 F.3d 857, 862 (2d Cir. 1997) (same). However, there are "two exceptions to this rule: when an inmate is able to show either (1) that he was disciplined without adequate due process as a result of the report; or (2) that the report was issued in retaliation for exercising a constitutionally protected right." *Willey*, 801 F.3d at 63 (citations and quotation marks omitted)). Here, Plaintiff alleges, under the second *Willey* prong, that the misbehavior report was issued in retaliation for the filing of multiple grievances against Gonzalez. (Compl. ¶¶ 50, 57, 69.) The filing of grievances is constitutionally protected activity. *See Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) ("It is well established that retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and

Fourteenth Amendments and is actionable under § 1983." (citation and quotation marks omitted)). Accordingly, Plaintiff sufficiently states a procedural due process claim based on the allegedly false and retaliatory misbehavior report. *See Franco v. Kelly*, 854 F.2d 584, 589–90 (2d Cir. 1988) (holding due process claim based on false misbehavior report was sufficient where the plaintiff alleged the report was "in retaliation for his cooperation with a state administrative investigation" and thus implicated "his broader right to petition government for redress of grievances"); *cf. Boddie*, 105 F.3d at 862 (dismissing due process claim based on false misbehavior report where the plaintiff's "claim that the officers conspired to retaliate against him [was] unsupported, speculative, and conclusory" (quotation marks omitted)); *Jackson v. Jackson*, No. 16-CV-8516, 2018 WL 1918626, at *3 (S.D.N.Y. Apr. 20, 2018) (dismissing due process claim based on false misbehavior report where the complaint was "devoid of any factual allegation concerning an implicated cognizable interest in life, liberty, or property"); *Cole v. Fischer*, No. 07-CV-11096, 2009 WL 130186, at *3 (S.D.N.Y. Jan. 15, 2009) (dismissing due process claim based on false misbehavior report where the plaintiff "does not suggest anything 'more' so as to implicate the violation of a constitutional right").

Moreover, Plaintiff alleges, under the first *Willey* prong, that after receiving the misbehavior report, he "received a disciplinary hearing," at which Ndulaka, testifying as a witness, "willingly lied" about the prison regulations relating to NGE crowns and tassels. (Compl. ¶¶ 57–60.) In general, "a claim of false testimony . . . at a disciplinary hearing, in and of itself, does not state a cognizable" procedural due process claim. *Cole*, 2009 WL 130186, at *3 (citation and quotation marks omitted). However, false testimony at a disciplinary hearing violates due process where the plaintiff demonstrates that "the hearing . . . was unfair." *Boddie*, 105 F.3d at 862. Here, Plaintiff alleges that Humphrey, who served as the hearing officer for the

disciplinary hearing, (Compl. ¶ 70), committed several due process violations: first, he was "hostile and biased and refused to relay" to Ndulaka Plaintiff's questions regarding Woodbourne's regulations pertaining to NGE crowns and tassels; second, he answered Plaintiff's questions himself, despite "not [being] an authority on religious headcovering[s]," thus demonstrating that he "was not an impartial hearing officer"; and third, he refused Plaintiff's request to call the "Ministerial Program Coordinator" as a witness despite Plaintiff having given him "sufficient information to locate" the witness. (*Id.* ¶¶ 71–77.)  Plaintiff was ultimately found guilty of the charges in the misbehavior report. (*Id.* ¶ 78.)  These allegations, taken as true, allege sufficient factual detail to suggest that Plaintiff's disciplinary hearing was "unfair." *Boddie*, 105 F.3d at 862.  Although "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply," *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974), "[c]ertain due process protections" do apply, including "a fair and impartial hearing officer" and "a reasonable opportunity to call witnesses," *Luna*, 356 F.3d at 487 (citation omitted); *see also Freeman*, 808 F.2d at 953 ("An inmate charged with a violation must be given . . . the opportunity to . . . call witnesses . . . ." (citing *Wolff*, 418 U.S. at 566)).  In sum, Plaintiff has sufficiently stated a procedural due process claim against Gonzalez, Ndulaka, and Humphrey.

However, to the extent Plaintiff alleges that the sentence imposed following his disciplinary hearing *itself* violates due process, that claim is foreclosed.  The Second Circuit has squarely held that confinement in SHU for "less than 101 days do[es] not generally raise a liberty interest warranting due process protection, and thus require proof of conditions more onerous than usual." *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009) (citation omitted).  A confinement of "fewer than 101 days could constitute atypical and significant hardships if," for

example, "the conditions were more severe than the normal SHU conditions." *Id.* (citations

omitted). Here, following the disciplinary hearing, Plaintiff received a sentence of 180 days in

SHU, which was later reduced by Venettozzi to 90 days. (Compl. ¶¶ 78–80.) Plaintiff alleges

that "[w]hile in SHU [he] was deprived of many activities and opportunities available to"

prisoners in the general population, (*id.* ¶¶ 84–87), but he does not allege that his confinement in

SHU was "more severe than the normal SHU conditions" or otherwise "atypical." *Davis*, 576

F.3d at 133. Accordingly, Plaintiff does not state a procedural due process claim as to the actual

punishment imposed alone. *See Martinaj v. Uhler*, No. 18-CV-257, 2019 WL 652251, at *8

(N.D.N.Y. Feb. 15, 2019) (dismissing procedural due process claim based on stays in SHU of up

to 33 days where there was no allegation that the plaintiffs "were confined to their cells for

longer than the typical duration per day, that they were denied exercise or adequate showers, or

. . . were otherwise exposed to conditions constituting atypical and significant hardships").

Finally, as to Plaintiff's allegation that Venettozzi, as the SHU Director, reviewed

Plaintiff's administrative appeal following his disciplinary hearing and "refus[ed] to overturn"

the guilty finding "despite . . . knowledge of . . . due process violations," (Compl. ¶¶ 79–80, 93),

Venettozzi is entitled to qualified immunity, (*see* Defs.' Mem. 20). Although "courts are in

general agreement that an appeal officer's failure to correct an ongoing violation may be a

ground for imposing [procedural due process] liability, courts are divided on whether an appeal

officer[]" may be held liable for "failure to correct a procedural due process error at the

[disciplinary] hearing below." *Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at *8

(S.D.N.Y. Jan. 24, 2017) (collecting cases); *see also Colon v. Annucci*, 344 F. Supp. 3d 612, 630

(S.D.N.Y. 2018) (same)). Here, Plaintiff does not appear to allege an ongoing procedural due

process violation, for, as noted, Plaintiff's placement in the SHU for 90 days is not a

constitutional violation. *Cf. Thomas v. Calero*, 824 F. Supp. 2d 488, 510 (S.D.N.Y. 2011) ("At the time of [the] plaintiff's [administrative] appeal . . . , he was confined in SHU and, following his appeal, his confinement in SHU continued, resulting in a total of 291 days of confinement. This is sufficient to support a finding that the . . . appeal was meant to address an ongoing violation that could have been remedied [on appeal]." (citation omitted)). Rather, Plaintiff alleges that discrete errors infected his disciplinary hearing and thus deprived him of his right to procedural due process. (*See* Compl. ¶¶ 57–60, 69–78, 93.) Because "the law in this area is unsettled, . . . it cannot be said that 'every reasonable official' would have known that failure to correct a procedural due process error on appeal violates an inmate's constitutional rights." *Lebron*, 2017 WL 365493, at *9 (citation omitted); *see also Constant v. Annucci*, No. 16-CV-3985, 2018 WL 1684411, at *6 (S.D.N.Y. Apr. 5, 2018) ("Defendant is entitled to qualified immunity because, given the uncertainty within the Circuit, it cannot be said that every reasonable official would have understood that affirming a disciplinary hearing containing procedural due process violations would violate an inmate's constitutional rights." (citation and quotation marks omitted)). Therefore, "although [Plaintiff's] right to procedural due process is well established, not every reasonable official would understand that [Venettozzi's] alleged conduct here violated Plaintiff's rights." *Lebron*, 2017 WL 365493, at *9. Accordingly, Venettozzi is entitled to qualified immunity on Plaintiff's due process claim.

### 6. State Law Claims

Plaintiff alleges claims under Article 1 of the New York Constitution, N.Y. Const. Art. 1 § 11, which provides in relevant part for equal protection; Section 610 of the New York Corrections Law, N.Y. Correct. Law § 610, which provides for freedom of worship; and DOCCS Directive No. 4202, which describes DOCCS religious programs and "covers the religious rights

and obligations of inmates." (*See* Compl. ¶¶ 88–91.) Plaintiff seeks declaratory and monetary relief. (*Id.* at 18–20.) Plaintiff's request for declaratory relief is moot. *See supra* Section II.B.1. Plaintiff's request for monetary relief is barred by New York Correction Law § 24, which provides that "[n]o civil action shall be brought in any court of the state . . . against any officer or employee of [DOCCS] . . . in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of employment and in the discharge of duties by such officer or employee." N.Y. Correct. Law § 24; *see also Baker v. Coughlin*, 77 F.3d 12, 15 (2d Cir. 1996) (holding that § 24 applies to claims in federal court). It is "well settled that [§] 24 shields employees of a state correctional facility from being called upon to personally answer a state law claim for damages based on activities that fall within the scope of the statute." *Ierardi v. Sisco*, 119 F.3d 183, 186 (2d Cir. 1997). Defendants clearly acted within the scope of their employment, as their actions as alleged in the Complaint "arose as a result of [their] discharging their duties as correctional officers." *Boyd v. Selmer*, 842 F. Supp. 52, 57 (N.D.N.Y. 1994). Accordingly, Plaintiff's state law claims must be dismissed with prejudice.

### III.  Conclusion

For the reasons stated above, Defendant's Motion To Dismiss is granted in part and denied in part. Plaintiff's claims seeking equitable relief, Free Exercise Clause claims, RLUIPA claims, Equal Protection Clause claims on the basis of religion, Due Process Clause claim against Venettozzi, and state law claims are dismissed *with* prejudice. Plaintiff's claims against Cunningham are dismissed *without* prejudice.[10]

---

[10] Plaintiff's First Amendment retaliation claims against DePaolo and Gonzalez, as well as his Due Process Clause claims against Gonzalez, DePaolo, and Ndulaka, remain. And, as noted above, Plaintiff is granted leave to replead an Equal Protection Clause claim on the basis of racial discrimination.

If Plaintiff wishes to file an amended complaint, Plaintiff must do so within 30 days of the date of this Opinion. Any newly filed complaint will replace, not supplement, the instant Complaint, and must contain all of the claims, exhibits, and factual allegations Plaintiff wishes the Court to consider, as well as all changes to correct the deficiencies identified in this Opinion. If Plaintiff fails to abide by the 30-day deadline, his claims may be dismissed with prejudice.

The Clerk is respectfully directed to terminate the pending Motion. (Dkt. No. 31.)

SO ORDERED.

Dated:   March  **15** , 2019
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE